IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HORIZON STEVEDORING, INC., : | | |
|     Plaintiff/Counterclaim Defendant, : | | CIVIL ACTION |
| : | | No. 22-711 |
| v. : | | |
| : | | |
| ROYAL WHITE CEMENT, INC., : | | |
|     Defendant/Counterclaim Plaintiff. : | | |
| : | | |
| v. : | | |
| : | | |
| JOHN BROWN, : | | |
|     Counterclaim Defendant : | | |

**MEMORANDUM**

**Schiller, J.**                                                                                                     **November 7, 2022**

    Horizon Stevedoring, Inc. and Royal White Cement, Inc. ("RWC") executed a term sheet for the proposed sale of one hundred percent of Horizon's outstanding capital stock to RWC and the assignment to RWC of Horizon's parent company's lease of Pier 82 from the Port of Philadelphia. When the stock sale and pier lease assignment were not consummated, Horizon sued RWC for breach of contract and a declaratory judgment. In response, RWC filed counterclaims against Horizon for breach of contract and unjust enrichment, and against Horizon and its Vice President John Brown for fraudulent and negligent misrepresentation and conversion. Counterclaim Defendants move for judgment on the pleadings with respect to RWC's unjust enrichment, fraudulent and negligent misrepresentation, and conversion counterclaims. For the reasons that follow, their motion will be granted in part and denied in part.

**I.  BACKGROUND**

    **A.  The Term Sheet and the Proposed Transaction**

    The Term Sheet for the proposed transaction was executed by RWC's President Marcel Fadi and Horizon's President Timothy Brown on September 13, 2021. (Counterclaim, ECF 5,

1

¶ 13.[1]) RWC alleges that Fadi and John Brown "engaged in numerous conversations" before then. (*Id.* ¶ 14.) It asserts that during their conversations, "Brown represented to Fadi that obtaining a lease assignment from PhilaPort . . . would not be an issue." (*Id.*) It also alleges that "Horizon and Brown repeatedly represented that PhilaPort would approve the lease assignment to RWC." (*Id.* ¶ 57; *see also id.* ¶ 76.) Horizon and Brown deny RWC's allegations about conversations between Fadi and Brown. (Answer to Counterclaim, ECF 8, ¶¶ 14, 57, 76.)

Horizon and RWC agree the Term Sheet is a binding agreement at least with respect to its Deposit, Confidentiality, Expenses, and Governing Law provisions. (*See* Compl. ¶ 38; Counterclaim ¶ 34.) The top of the Term Sheet's first page states that it is a summary of the proposed transaction's terms and conditions, "is for discussion purposes only and, except for the provisions captioned 'Deposit,' 'Confidentiality,' 'Expenses,' and 'Governing Law' is not binding upon any party." (Term Sheet, Compl. Ex. A, ECF 1-1 at ECF p. 2 (capitalization omitted).) It also states that the parties to the Term Sheet "are not obligated to consummate a transaction unless and until definitive deal documents have been mutually agreed to and executed by the parties hereto." (*Id.* (capitalization omitted).)

The Term Sheet's first provision, captioned "Transaction," memorializes the expectation that RWC or an affiliate would purchase all of Horizon's outstanding capital stock and, "[c]ontemporaneously with the sale," Penn Warehousing & Distribution ("PWD")[2] would assign RWC "all of its right, title, and interest in" Pier 82's lease. (Term Sheet at ECF p. 2.) In a subsequent provision also captioned "Transaction," RWC and Horizon agreed to "work in good

---

[1] RWC's Amended Answer and Counterclaim are both included in the document at ECF 5. The Court references them separately because both sections start at paragraph number 1.

[2] RWC alleges PWD is Horizon's Parent Company. (Am. Answer ¶ 13.)

faith to structure a mutually acceptable transaction . . . in the most tax efficient manner for both parties." (*Id.*)

The "Purchase Price" provision provides that the price for both Horizon's outstanding capital stock and the lease assignment for Pier 82 would be $3,000,000 "in cash, payable at the Closing of the Transaction." (Term Sheet at ECF p. 2.) In the provision captioned "Closing," Horizon and RWC agreed the transaction would close "no later than 60 days after PhilaPort approves the assignment of the lease" or after PhilaPort's "entry into a new lease for Pier 82" with RWC. (*Id.*) Pursuant to the "Definitive Agreements" provision, the parties agreed to "work diligently to prepare, execute and deliver the purchase agreement . . . and related agreements . . ." after execution of the Term Sheet. (*Id.* at ECF p. 3.) No party alleges that any Definitive Agreement was ever executed.

Consistent with the "Deposit" provision, RWC paid Horizon $300,000 contemporaneously with its execution of the Term Sheet. (*Id.* at ECF p. 3.) The Deposit was to be returned to RWC "without interest" in the event that: (1) Horizon or PWD breached their obligation to close the Transaction under a later-executed Purchase Agreement and related Agreements (collectively, the "Definitive Agreements"), or (2) PhilaPort did "not approve the assignment of the Lease or enter into a new lease for Pier 82 with" RWC. (*Id.*; *see also* Compl. ¶ 16; Am. Answer, ECF 5, ¶ 16.) Horizon would retain the Deposit if the transaction failed to close "for any other reason." (Term Sheet at ECF p. 2.)

Under the "Due Diligence" provision, RWC had fifteen days from the date of execution "to contact the Port to begin negotiations of the assumption and/or assignment of the subject leasehold held for Pier 82" and was obligated to "proceed with said negotiations in good faith." (*Id.* at ECF p. 3.) Horizon was required to supply RWC "with a full list" of its assets and liabilities.

3

(*Id.*) RWC had forty-five days "to pursue its understanding" of those assets and liabilities "while pursuing the assignment and/or assumption of the Pier 82 lease." (*Id.*)

### B. The Amended Term Sheet

The Term Sheet's Due Diligence provision was amended on October 27, 2021 to give RWC "until January 7, 2022 to complete its Due Diligence . . . while pursuing the assignment and/or assumption of the Pier 82 lease." (Oct. 27, 2021 Letter Re: Amendment to Term Sheet, Compl. Ex. B, ECF 1-2.) The amendment still required RWC to "negotiate in good faith with PhilaPort for the assumption and/or assignment of the subject leasehold held for Pier 82." (*Id.*)

### C. Due Diligence Efforts and Communications with PhilaPort

Horizon and RWC exchanged information and drafts of Definitive Agreements beginning in September 2021 through January 2022. (Compl. ¶ 18; Am. Answer ¶ 18.) In its Counterclaim, RWC alleges "Horizon and Brown repeatedly represented that PhilaPort would approve the Lease assignment to RWC." (Counterclaim ¶ 57; *see also id.* ¶¶ 73, 76.) Nevertheless, according to RWC, it "became apparent that PhilaPort would not approve a Lease assignment without additional action on the part of PWD and/or Horizon," and it alleges those "actions were never contemplated under the terms of the Term Sheet." (*Id.* ¶¶ 62, 81.)

Horizon alleges it "made additional good faith efforts, through PWD, to secure PhilaPort's approval of its assignment of the Lease to RWC." (Compl. ¶ 19.) Horizon contends "PhilaPort conditioned its approval on the review of a 'specific deal' between RWC and Horizon." (*Id.*) It also alleges it "responded in full to each of RWC's due diligence requests . . . ." (*Id.*)

RWC denies Horizon responded in full to each of its due diligence requests and denies Horizon made any additional good faith efforts to secure PhilaPort's approval of the lease assignment required for consummation of the sale. (Am. Answer ¶ 19.) It alleges it is "unaware of any specific conditions that PhilaPort placed upon its approval of the assignment of the Lease"

4

because "PhilaPort refused to communicate with RWC." (*Id.* ¶ 19.) RWC also asserts that Horizon and Brown "knew, or should have known, that at no point did PhilaPort intend to approve the assignment of the lease." (Counterclaim ¶¶ 64, 83.)

More specifically, RWC alleges it "made multiple attempts to obtain Due Diligence responses from PhilaPort related to the Lease assignment, to no avail." (Counterclaim ¶ 18.) In a December 1, 2021 letter from RWC to Horizon, RWC explained it had "made multiple attempts to get answers from Phila port [sic] with no success at all, even requested meeting with Phila port CEO," but that on October 26, the Port's CEO refused to meet with Fadi and said any lease modification needed to be "done by Horizon and or Mr. Brown . . . ." (Counterclaim Ex. C., ECF 5-3 at ECF p. 2.) RWC wrote that, "to complete its due diligence," it wanted certain clarifications about Horizon's existing lease. (*Id.* at ECF p. 2-3.) On December 23, RWC's counsel emailed Horizon's counsel still seeking answers to its clarification requests. (Counterclaim Ex D., ECF 5-4 at ECF p. 3.) Horizon's counsel replied on December 24 with "responses . . . based on the information available to Penn Warehousing and Horizon Stevedoring." (*Id.* at ECF p. 2-3.) On December 28, RWC's plant manager emailed John Brown about Horizon's responses explaining, "we haven't gotten anywhere yet and are no closer to Closing with the lack of Correspondence from the Port." (*Id.* at ECF p. 2.) He noted that Horizon's December 24 responses made "no mention of Sending to the State Port Authority [sic] to get [RWC] an answer to what [PhilaPort] will agree to." (*Id.*) He asked Brown if he could "advise" RWC about what he could "do to help us with [PhilaPort] on this Matter." (*Id.*)

On January 4, 2022, RWC's counsel emailed Horizon's counsel after RWC communicated that it had been unable to arrange a meeting with PhilaPort's president. (Compl. Ex. C at ECF p. 4.) He explained his client had "been directed to go to [Horizon] to further the communications

5

with the Port . . . ." (*Id.*) On January 5, Horizon's counsel responded that PhilaPort also had told John Brown it would "not talk to him" until there was "a specific deal to present" to PhilaPort. (*Id.* at ECF p. 3.) Horizon's attorney suggested the appropriate "next steps," even if "somewhat inefficient," would be "to finalize the transaction documentation and add a closing condition that [RWC] is satisfied with its due diligence" and he proposed sending a revised draft agreement to RWC's attorney for review. (*Id.*) Within ten minutes, RWC's counsel responded, "[a]greed, when you don't have any options your chooses [sic] are clear." (*Id.* at ECF p. 2-3.) On January 7, Horizon's counsel forwarded RWC's counsel a revised draft Stock Purchase Agreement "providing for the due diligence condition to closing we discussed" and asked him to respond if there were "any questions or concerns." (*Id.* at ECF p. 2.)

### D. The Transaction Fails to Close

After that, RWC did not execute or further negotiate the Stock Purchase Agreement. (Compl., ¶ 23; Am. Answer ¶ 23.) RWC alleges it did not move forward with the transaction because "PhilaPort did not provide the necessary information for RWC to evaluate and, ultimately, PhilaPort refused to approve the assignment of the lease." (Counterclaim ¶ 28.) It asserts PhilaPort has not even discussed a Lease assignment or "given any indication that it will in the future approve, or discuss such a Lease assignment." (*Id.* ¶ 30.)

Once the transaction failed to close, RWC's counsel sent Horizon's counsel a letter asking him to "accept this correspondence as formal termination of any agreement between the parties and request for the return of the Royal White Cement deposit of $300,000 . . . ." (Counterclaim Ex. F, ECF 5-6.) The letter is dated *December* 11, 2022 (*id.* (emphasis added)), however, a February 15, 2022 letter from RWC's new counsel to Horizon's attorney explains the notice of cancellation from RWC's first attorney was "incorrectly dated" and "was provided to [Horizon's counsel] on January 11, 2022, four days after the expiration of the due diligence period." (Compl.

Ex. D, ECF 1-4 at ECF p. 5 n.1.) RWC alleges it did not, at any point, "consent to Horizon or Brown retaining the Deposit funds in the event PhilaPort did not approve the assignment of the Lease." (Counterclaim ¶ 90.)

The February 15 letter from RWC's lawyer to Horizon's lawyer reiterated RWC's request that Horizon return its deposit. (*Id.* at ECF p. 5.) It also attached a draft civil action complaint against Horizon and Brown for breach of contract, punitive damages, and fraudulent misrepresentation that RWC had authorized its attorney to file if the deposit was not returned to RWC "within the next ten days." (*Id.*)

Horizon did not return RWC's deposit. (Compl. ¶ 25; Am. Answer ¶ 25.)

### E. This Action

Instead, nine days later, on February 24, Horizon filed this action for breach of contract and a declaratory judgment against RWC. (Compl.) RWC answered the Complaint on March 14 (Answer, ECF 2), and on April 1, it filed an Amended Answer with a Counterclaim against Horizon and John Brown. (Am. Answer and Counterclaim.) RWC's Counterclaim asserts claims for breach of contract and unjust enrichment against Horizon and for fraudulent and negligent misrepresentation and conversion against Horizon and Brown. (*Id.*) Horizon and Brown answered the Counterclaim on April 14. (ECF 8.) On May 13, they filed their motion for partial judgment on the pleadings. (ECF 12.)

## II. STANDARD OF REVIEW

Horizon and Brown move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Their motion is governed by the same standard as a Rule 12(b)(6) motion to dismiss for failure to state a claim. *See Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010). To withstand judgment, RWC's counterclaim must include facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is

facially plausible when the facts pled "allow [ ] the court to draw the reasonable inference that [a] defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A Court considering a Rule 12(c) motion "must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party:" in this case, RWC. *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005). Well-pleaded factual allegations are presumed to be true. *Iqbal*, 556 U.S. at 679; *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). Conclusory assertions of fact and legal conclusions are not. *See Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

To decide a motion for judgment on the pleadings, "courts review the pleadings, exhibits attached to the pleadings, matters of public record, and undisputedly authentic documents attached to the motion for judgment on the pleadings if plaintiffs' claims are based on the documents." *Atul K. Amin Fam. Ltd. P'ship v. Steward Easton Hosp., Inc.*, No. 20-04161, 2021 WL 2012509, at *2 (E.D. Pa. May 19, 2021) (internal quotation and citation omitted); *see also Sprague v. Neil*, No. 05-1605, 2007 WL 3085604, at *2 (M.D. Pa. Oct. 19, 2007) (citation omitted) ("[C]ourts consider not only the complaint but also the answer and written instruments attached to the pleadings."). "If the court considers matters outside pleadings other than documents integral to or explicitly relied upon in the complaint, the motion must be treated as one for summary judgment under Rule 56." *Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019) (internal quotation and citation omitted).

### III.   DISCUSSION

Horizon and Brown move for judgment on the pleadings with respect to RWC's unjust

enrichment, fraudulent and negligent misrepresentation, and conversion counterclaims.[3] They contend Pennsylvania's gist of the action doctrine bars RWC's conversion and fraudulent/negligent misrepresentation claims. (Counterclaim Defs.' Br., ECF 12-1 at 4-5.) They also argue that RWC's fraudulent misrepresentation claims are insufficiently pled under Federal Rule of Civil Procedure 9(b) (*id.* at 8-9) and that RWC fails to state a claim for actionable fraud. (*Id.* at 10.) Finally, Horizon and Brown argue RWC's unjust enrichment claim is barred by the existence of a valid and enforceable contract. (*Id.* at 3-4.) The Court considers their arguments in turn.

### A. The Gist of the Action Doctrine

Pennsylvania's gist of the action doctrine bars tort claims against contracting parties where they are, "in actuality, a claim against the party for breach of its contractual obligations." *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 53 (Pa. 2014). The "source of duty" inquiry is the "touchstone standard for ascertaining the true gist or gravamen of a claim[.]" *Id.* at 69. The doctrine precludes plaintiffs from "recasting ordinary breach of contract claims into tort claims[,]" because "tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals." *Williams v. Hilton Grp. PLC*, 93 F. App'x 384, 386 (3d Cir. 2004) (internal quotation marks omitted).

When wielding the doctrine to dismiss tort claims before discovery, a court should "exercise caution" because the question of "[w]hether a duty arises under a contract is a fact-intensive inquiry . . . ." *Zaftr Inc. v. Lawrence*, No. 21-2177, 2021 WL 4989769, at *5 (E.D. Pa. Oct. 27, 2021); *see also Addie v. Kjaer*, 737 F.3d 854, 868 (3d. Cir. 2013) ("Application of this

---

[3] They do not seek to dismiss RWC's breach of contract counterclaim.

9

doctrine frequently requires courts to engage in a factually intensive inquiry as to the nature of a plaintiff's claims.").

### i. Conversion

Horizon and Brown argue Count V of RWC's Counterclaim—its conversion claim—should be dismissed because it is "grounded solely" in Horizon's alleged failure to fulfill its obligations under the Term Sheet. (Counterclaim Defs.' Br. at 7-8.) Conversion is the "deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification." *Universal Premium Acceptance Corp. v. York Bank & Tr. Co.*, 69 F.3d 695, 704 (3d Cir. 1995) (citation and internal quotation omitted). RWC alleges Horizon and Brown are liable for conversion because they: (1) "knew" RWC's deposit paid to Horizon was "refundable" if "PhilaPort did not provide approval of the Lease assignment"; (2) RWC never consented "to Horizon or Brown retaining the Deposit funds in the event PhilaPort did not approve an assignment of the Lease"; and (3) although Horizon and Brown have an "obligation to return the Deposit funds," they have retained the Deposit without "legal justification. (Counterclaim ¶¶ 88-91.)

Although RWC contends Horizon and Brown converted the Deposit, in its Amended Answer to Horizon's Complaint, RWC also asserts that the failure to return the Deposit was a breach of Horizon's obligations in the Term Sheet. (*See* Am. Answer, ¶¶ 40-41 ("Horizon breached its obligations in the Term Sheet by . . . refusing to return RWC's Deposit of $300,000[ ] after PhilaPort refused to approve the assignment of the Lease to RWC or to enter into a new lease for Pier 82 with RWC.").) And in its Counterclaim, RWC alleges Horizon breached the Term Sheet and Amended Term Sheet by, inter alia, refusing "to return RWC's Deposit . . . ." (Counterclaim, ¶ 41(b).)

There is no question that any duty to return RWC's $300,000 deposit is governed by the

Term Sheet's binding Deposit provision. The Court will dismiss Count V of RWC's counterclaim because it is barred by the gist of the action doctrine.

### ii. Fraudulent and Negligent Misrepresentation

Horizon and Brown argue the gist of the action doctrine also requires the Court to dismiss RWC's fraudulent/negligent misrepresentation claims[4] because they arise "from representations or duties imposed by the Term Sheet . . . ." (Counterclaim Defs.' Br. at 5.) RWC maintains the gist of the action doctrine does not bar these claims because the "most crucial misrepresentation[s]" do not arise from the Term Sheet. (Counterclaim Pl.'s Resp. Br., ECF 13-1 at 13.) In its view, the relevant misrepresentations are Brown's alleged statements to Fadi that obtaining a Lease assignment from PhilaPort would not be an issue. (*Id.* at 13.)

As RWC sees it, Horizon and Brown induced it to agree to the Term Sheet's binding provisions with deceptive representations about PhilaPort's willingness to assign the Lease. It alleges "Fadi engaged in numerous conversations with . . . Brown" that it "would not be an issue" to obtain a Lease assignment from PhilaPort "[p]rior to the execution of the Term Sheet." (Counterclaim ¶ 5.) It also alleges that "Horizon and Brown repeatedly represented that PhilaPort would approve the Lease assignment to RWC" (*Id.* ¶ 57) and that "Brown represented to Fadi that the assignment of the Lease would not be an issue" "on multiple occasions." (*Id.* ¶ 73.) RWC does not allege where or specifically when any of these statements occurred.

Courts focus "on the specific factual circumstances in determining whether to bar a fraud in the inducement or negligent misrepresentation claim under the gist of the action doctrine." *U.S. Claims, Inc. v. Saffren & Weinberg, LLP.*, No. 07-0543, 2007 WL 4225536, at *12 (E.D. Pa. Nov.

---

[4] Although RWC's Counterclaim does not plead its misrepresentation claims as separate counts for fraudulent and negligent misrepresentation, the Court treats them as if they are distinct because the claims are subject to different burdens of pleading.

11

29, 2007). What matters is whether the allegedly false or negligent representation concerns duties that are "collateral to or interwoven in" the relevant contract. *Id.*

29, 2007). What matters is whether the allegedly false or negligent representation concerns duties that are "collateral to or interwoven in" the relevant contract. *Id.*

### a. Fraudulent Misrepresentation

It would be premature to bar RWC's fraudulent misrepresentation counterclaims based on the gist of the action. Even so, the Court will dismiss them because they are insufficiently pled. To state a fraudulent misrepresentation claim, RWC must allege facts to show: (1) a representation; (2) material to the proposed transaction; (3) made with knowledge of its falsity or recklessness as to whether it is true or false; (4) with an intent to mislead RWC into relying on it; (5) justifiable reliance; and (6) the reliance proximately caused an injury to RWC. *Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637, 646 (Pa. 2021) (citing *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999)). With respect to the last element, RWC must show Horizon's and/or Brown's "acts or omissions were a substantial factor in bringing about its harm." *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 771 (3d Cir. 2009) (citation omitted). "All of these elements must be present to warrant the extreme sanction of voiding the contract." *Porreco v. Porreco*, 811 A.2d 566, 570-71 (Pa. 2002). "A claim for fraudulent inducement . . . is available when a person under no duty to enter a contract was deceived into doing so." *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 206 (3d Cir. 2022); *see also Lemons v. Meguerian*, No. 21-1737, 2022 WL 1289128, at *4 (E.D. Pa. Apr. 29, 2022).

The gist of the action doctrine bars fraudulent misrepresentation claims that rely on allegations of fraud occurring "after the execution of the contract and pursuant to the terms of the contract." *Baum v. Schlesinger*, No. 21-944, 2022 WL 3716682 (W.D. Pa. May 26, 2022). The doctrine also "may apply to bar . . . claims related to fraudulent inducement where the false representation concern[s] duties later enshrined in the contract." *Bengal Converting Servs., Inc. v. Dual Printing, Inc.*, No. 11-6375, 2012 WL 831965, at *3 (E.D. Pa. Mar. 13, 2012) (emphasis in

original) (citing *Pediatrix Screening, Inc. v. Telechem Int'l, Inc.*, 602 F.3d 541, 550 (3d Cir. 2010) (further citation omitted)). So, if RWC's fraudulent misrepresentation claims rely on "precontractual statements" that "concern specific duties that [were] later outlined in [a] contract," the gist of the action doctrine bars them. *N. Penn Towns, LP v. Concert Golf Partners, LLC*, No. 19-4540, 2022 WL 2985632, at *18 (E.D. Pa. July 28, 2022). But there is also "a precontractual duty not to deceive through misrepresentation or concealment" that "exists independently of a later-created contract." *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 217 (3d Cir. 2022).

RWC alleges it relied on Horizon and Brown's repeated representations "that PhilaPort would approve the lease assignment to RWC"[5] when it paid Horizon the $300,000 Deposit pursuant to the Deposit Provision in the Term Sheet." (Counterclaim ¶¶ 57-58.) It also alleges Horizon "knew or should have known, that at no point did PhilaPort intend to approve the assignment of the Lease." (*Id.* ¶ 64.) To the extent that RWC's fraudulent misrepresentation claims rely on misrepresentations that were made before the Term Sheet was executed and "without a binding contract, any duty [Horizon or Brown] owed [RWC] during negotiations was grounded only in tort." *SodexoMAGIC*, 24 F.4th at 217; *cf. Baum*, 2022 WL 3716682, at *9) (holding gist of the action barred a fraudulent misrepresentation claim that had "only a single conclusory

---

[5] Horizon and Brown argue RWC cannot base its fraudulent misrepresentation claims on PhilaPort's future conduct, which was beyond their control, or "a broken promise to do or refrain from doing something in the future . . . ." (Defs' Reply, ECF 16 at 9.) "Opinions or predictions" and "promises to do or refrain from future acts" "generally are not sufficient," to constitute an actionable misrepresentation. *Daimler v. Moehle*, No. 18-165, 2019 WL 2422843, at *5 (W.D. Pa. June 10, 2019). However, the real issue is not whether PhilaPort's purported willingness to assign the Lease "constituted a promise to engage in a future act, because [PhilaPort] is not the speaker alleged to have made a fraudulent misrepresentation; the issue is the nature of [Horizon and/or Brown's] statements regarding the existence of [PhilaPort's] commitment." *Id.* RWC has sufficiently alleged Counterclaim Defendants' statements about the feasibility of obtaining a Lease assignment from PhilaPort were actionable representations, *i.e.*, predictions that "foster[ed] a belief in a specific and definite outcome." *Id.*

allegation" regarding "fraud before the execution of the contract" and all the other allegations of fraud "occurred after the Agreement was signed"). Construing the pleadings' allegations in the light most favorable to RWC, it is more than just possible that its claims rely on misrepresentations made before there was any contract between RWC and Horizon and that the obligations pertaining to the Lease assignment that are enshrined in the Term Sheet are not the true gist of RWC's misrepresentation claims.

### 1. Heightened Pleading Standard for Fraud

Nevertheless, more is needed for RWC's fraudulent misrepresentation counterclaims to withstand Horizon and Brown's motion. RWC has not pleaded enough detail about the alleged misrepresentations to satisfy Federal Rule of Civil Procedure 9(b)'s requirements. Although "intent, knowledge and other conditions of a person's mind may be alleged generally," to survive Counterclaim Defendants' motion, RWC "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see also Petruska v. Gannan Univ.*, 462 F.3d 294, 310 (3d Cir. 2006) (explaining that a state law fraudulent misrepresentation claim must be pled with particularity under Rule 9(b)). RWC's Counterclaim "must allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation," and it must allege sufficiently particular facts to provide Horizon and Brown with notice of their alleged misconduct. *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 778 (3d Cir. 2018).

RWC's generalized allegations of "numerous conversations" or "repeated representations" that happened on unspecified dates and in unspecified places are not sufficiently particular to plausibly plead its claims for fraudulent misrepresentation. (*See, e.g.,* Counterclaim ¶¶ 5, 57.) The Court grants Horizon and Brown's motion and dismisses Counts III and IV of RWC's Counterclaim to the extent that they assert claims for fraudulent misrepresentation.

14

### b. Negligent Misrepresentation

The Court will not dismiss RWC's negligent misrepresentation counterclaims based on the gist of the action. In addition, unlike RWC's misrepresentation claims, they need not meet Rule 9(b)'s requirements and are sufficiently pled. Negligent misrepresentation also differs from fraudulent misrepresentation "in that the misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words." *Gregg*, 245 A.3d at 646 (citation and internal quotation omitted). Like any action in negligence, "there must be an existence of a duty" owed by the defendant to the injured plaintiff. *Bortz*, 729 A.2d at 561.

Viewing the allegations in the light most favorable to RWC, the pleadings leave unclear the extent of any overlap between the Term Sheet's binding provisions and RWC's claims that Horizon and/or Brown induced it to enter into them by representing that PhilaPort would assign the lease without making a reasonable investigation into whether that was true. *Cf. Se. Pa. Transp. Auth. v. Drummond Decatur & State Props., LLC*, No. 21-4212, 2022 WL 784531, at *4 (E.D. Pa. Mar. 15, 2022) (holding the gist of the action did not bar a negligent misrepresentation claim based on allegations that the plaintiff entered into a lease in reliance on the defendant's misrepresentations about the condition of the premises). Although discovery may reveal otherwise, there is at least a possibility that RWC has a cause of action against Horizon and/or Brown for negligent misrepresentation, that is separate from a claim for a breach of the Term Sheet. The Court denies Horizon and Brown's motion with respect to Counts III and IV of RWC's Counterclaim to the extent they assert claims for negligent misrepresentation.

### B. Unjust Enrichment

To proceed with its unjust enrichment claim against Horizon, RWC must allege facts to show (1) benefits it conferred on Horizon, (2) Horizon's appreciation of such benefits and

(3) Horizon's acceptance and retention of such benefits under such circumstances that it would be inequitable for Horizon to retain the benefits without payment of value. *See Ne. Fence & Iron Works, Inc. v. Murphy Quigley Co.*, 933 A.2d 664, 669 (Pa. Super. Ct. 2007). "Because an unjust enrichment claim is a 'quasi-contract' claim, a party cannot recover on this claim when there is a valid contract." *Gen3 Mktg. LEP v. Ella Paradis, Inc.*, No. 19-3498, 2020 WL 247528, at *3 (E.D. Pa. Jan. 15, 2020)) (citing *Ne. Fence & Iron Works*, 933 A.2d at 669).

Horizon contends RWC's unjust enrichment claim cannot stand because "both parties have expressly alleged that the Term Sheet constitutes a valid and binding contract between them with respect to the payment and return of the deposit at issue." (Counterclaim Defs.' Br. at 3-4.) RWC responds that it states a plausible alternative claim for unjust enrichment because it is not yet clear whether it "will be able to contest the validity of the Term Sheet" based on its fraudulent and negligent misrepresentation claims against Horizon and Brown. (Counterclaim Pl.'s Resp. Br., at 10.) It argues that if it ultimately succeeds on those claims, it "would have the option to void the contract and seek recovery under a theory of unjust enrichment" and it should have "the opportunity to investigate its claims through discovery." (*Id.* at 10-11)

In the end, a party can only recover for breach of contract or for unjust enrichment. But a plaintiff "may plead unjust enrichment in the alternative if there is some dispute as to the validity, enforceability, or applicability of the alleged contract." *Zaftr Inc.*, 2021 WL 4989769, at *4; *see also Grudkowski v. Foremost Ins. Co.*, 556 F. App'x 165, 170 n.8 (3d Cir. 2014) (pleading an unjust enrichment claim in the alternative "is plausible only when the validity of the contract itself is actually disputed, making unjust enrichment a potentially available remedy"). Because RWC's negligent misrepresentation claim survives this stage of the litigation, it would be premature to dismiss its counterclaim for unjust enrichment. *See Landair Transp., Inc. v. Del's Truck & Auto*

*Repair*, No. 17-0723, 2018 WL 950208, at *5 (M.D. Pa. Feb. 20, 2018) (holding it would be premature to foreclose the plaintiff from pursuing its unjust enrichment claim where it was "possible that Plaintiff may be able to void the written contract in this matter based on Defendant's alleged fraudulent misrepresentations"). RWC may proceed on a theory of unjust enrichment as an alternative theory even though it may not ultimately recover both for breach of contract and for unjust enrichment.

    C. <u>**Leave to Amend**</u>

A court granting a motion for judgment on the pleadings should freely give leave to amend unless doing so would be futile. *Bloomfield v. Wissinoming Volunteer Tr. Aid Corps, Inc.*, No. 15-1013, 2015 WL 4077048, at *6 (E.D. Pa. July 6, 2015); *see Accurso v. Infra-Red Servs., Inc.*, 23 F. Supp. 3d 494, 501 (E.D. Pa. 2014) ("[T]here certainly is no categorical rule that judgment on the pleadings is per se with prejudice."). Federal Rule of Civil Procedure 15 permits a party to amend its pleading with the court's permission. Fed. R. Civ. P. 15(a)(2). Courts should grant leave to amend when justice so requires but should not do so if it would cause undue delay or undue prejudice, if the request is in bad faith or a result of dilatory conduct, or if the amendment would be futile. *See Bell v. Allstate Ins. Co.*, No. 03-4482, 2004 WL 614828, at *1 (E.D. Pa. Feb. 17, 2004). An amendment is futile if, as amended, the complaint still fails to state a claim. *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). When making this assessment, the court should apply the same legal sufficiency standard as it applies under Rule 12(b)(6). *Id.*

To the extent that Count III and Count IV assert claims for fraudulent misrepresentation against Horizon and Brown, they are dismissed without prejudice with leave to amend if RWC can allege sufficient facts about the alleged misrepresentations to meet Rule 9(b)'s heightened pleading standard. RWC's counterclaim for conversion (Count V) is dismissed with prejudice, as it is barred by the gist of the action doctrine and any amendment would be futile.

### IV. Conclusion

For the reasons discussed above, Horizon and Brown's motion is denied with respect to Count II—RWC's counterclaim for unjust enrichment—and with respect to Counts III and IV of RWC's Counterclaim to the extent they assert claims for negligent misrepresentation. Their motion is granted with respect to Count V—RWC's counterclaim for conversion—and with respect to Counts III and IV of RWC's Counterclaim to the extent they assert claims for fraudulent misrepresentation. Count V is dismissed with prejudice. RWC is granted leave to amend its claims for fraudulent misrepresentation if it can plead facts sufficient to meet the requirements of Rule 9(b).

An Order consistent with this Memorandum will be docketed separately.